**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | | |
|---|---|---|
| **VERONICA STELLAS,** | ) | |
| **Plaintiff/Counter-defendant,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **BWXT Y-12, LLC, GROUP LONG** | ) | **3:04-cv-7** |
| **TERM DISABILITY PLAN,** | ) | |
| **Defendant,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **METROPOLITAN LIFE INSURANCE** | ) | |
| **COMPANY,** | ) | |
| **Defendant/Counter-plaintiff.** | ) | |

## MEMORANDUM OPINION

This civil action is brought pursuant to the Employee Retirement Income Security

Act (ERISA), 29 U.S.C. § 1001, *et seq.* Defendant/Counter-plaintiff, Metropolitan Life

Insurance Company (MetLife), and defendant, Long Term Disability Plan for Employees

of BWXT Y-12, LLC (Plan), have moved for entry of judgment on the administrative

record [ECF# 22]. Plaintiff, Veronica Stellas (Stellas), has moved the court for judgment

on the pleadings [ECF# 26]. MetLife and the Plan have responded in opposition to

plaintiff's motion [ECF# 28]. Stellas has filed a response brief to defendants' motion

[ECF# 29] and a reply brief [ECF# 30]. MetLife and the Plan have also filed a reply

[ECF# 31]. For the reasons that follow, defendants' motion is DENIED and plaintiff's

motion is GRANTED.

## BACKGROUND

Plaintiff began working at Lockheed Martin Energy Systems, Inc. as an Accounting Support Specialist on December 2, 1991. She was a participant in the Plan through her employment. The Plan's Administrator is BWXT Y-12, LLC (BWXT), who funds benefits out of its general assets. MetLife, who performs its services pursuant to an administrative services agreement (ASA) with BWXT, serves as the Claims Fiduciary responsible for administering the long-term disability (LTD) benefits claims, but does not insure the Plan. Thus, MetLife has no financial interest in whether plaintiff's claim was granted or denied.[1]

According to the administrative record before MetLife, plaintiff's last day of work was January 25, 2000. Shortly thereafter, she applied for and received short-term disability (STD) benefits until July 19, 2000. In conjunction with Stellas' application for STD benefits, Dr. James Burns, her treating rheumatologist, completed an assessment form on January 28, 2000. He stated that Stellas had been unable to work since January 25, 2000, due to fibromyalgia and osteoarthritis. He opined "pt. unable to sit, stand or walk >1 hr or work rigid schedules; lifting > 10 lb."

---

[1]Because MetLife had no financial incentive to deny the claim as it was not the entity responsible for paying granted claims under the Plan, the court finds that MetLife was not operating under any genuine conflict of interest in determining plaintiff's eligibility for benefits. *See Goad v. Lockheed Martin Energy Sys., Inc.*, 8 Fed. Appx. 524, 2001 WL 493403 (6th Cir. May 2, 2001).

2

On June 26, 2000, Stellas applied for LTD benefits.  On her application, plaintiff stated that she was unable to work because of "severe muscle spasm and chronic pain" that left her "unable to keep or maintain [a] regular schedule."  In support of her claim, plaintiff submitted an Attending Physician's Statement (APS) recently completed by Dr. Burns.  His primary diagnosis for plaintiff was fibromyalgia, with a secondary diagnosis of osteoporosis/arthritis.  Dr. Burns' objective findings were trigger points and Heberden and Buchard nodes, while plaintiff's subjective symptoms were joint and muscle pain. Regarding plaintiff's physical abilities, Dr.  Burns indicated plaintiff per day could sit two hours, stand one hour and walk one hour, all intermittently; could not climb or twist/bend/stoop; could reach above shoulder level and operate a motor vehicle; could occasionally (1 to 35 percent of the time) lift up to 20 pounds; could repetitively perform fine finger movements and eye/hand movements, but not pushing or pulling; and could work a total of 4 to 6 hours per day.  Dr. Burns did not expect plaintiff to improve in any area.  He did not assess her psychological function.

Upon initially reviewing plaintiff's claim for LTD benefits, MetLife noted that plaintiff had numbness in her right hand and joint involvement/osteoarthritis, along with active fibromyalgia trigger points.  These findings substantiated Stellas' claim of inability to work as an Accounting Support Specialist, as the position required computer/keyboarding work.  Thus, MetLife determined that plaintiff was "totally disabled" under the Plan's "own occupation" definition of total disability, which applies for the first 24 months of a Plan participant's total disability.  Accordingly, MetLife began paying LTD benefits to plaintiff beginning July 20, 2000.

3

On October 21, 2000, Dr. Burns completed a "fibromyalgia questionnaire" drafted by MetLife. He identified the trigger points and detailed plaintiff's symptoms of pain, headache, depression, disturbed sleep and fatigue. He noted that "fatigue and energy limits [ ] early AM fixed schedule," and that "stress [increases] muscle pain."

In April 2002, MetLife requested an updated APS from Dr. Burns on a form different than those used previously. This particular form no longer asked how long Stellas could sit, stand and walk. Instead, the physician was required to rate plaintiff's capacity for sitting and standing on a three-point scale of "no limitation," "some limitation," or "avoid completely." On April 18, 2002, Dr. Burns opined that plaintiff was totally disabled for any occupation and should completely avoid assuming cramped/unusual positions; pushing/pulling/twisting (arm/leg controls); repetitive movement (hand/feet); climbing (stairs/ladders/scaffolds); balancing (exposure to falling); operating truck/dolly/small vehicle; operating heavy equipment; and operating electrical equipment. He concluded that she had some limitation regarding standing, sitting, change of position (sitting/standing); reaching (forward/overhead); grasping/handling; finger dexterity; bending/stooping/squatting and concentrated visual attention. Dr. Burns assessed that plaintiff could lift 0 to 15 pounds less than 20% of the time. The physician also noted that plaintiff did not have a past or present psychological problem that might interfere with her ability to work, and had no limitation regarding transportation. He indicated that plaintiff visited him once every 3 to 4 months.

4

After a participant receives LTD benefits for a period of 24 months, the Plan's definition of "totally disabled" transitions for that participant from an "own occupation" definition to a more stringent "any occupation" definition. As the transition date approached, MetLife began to assess whether plaintiff was unable to work at any job for which she might be qualified, based on her education, training and experience. At that time, the administrative record before MetLife included the April 18, 2002 APS completed by Dr. Burns.

A Transferable Skills Analysis (TSA) report was prepared by Stephanie Seely, M.S., CRC, Rehabilitation Consultant on May 30, 2002. It appears the report was based extensively on plaintiff's physical restrictions and limitations as set forth in Dr. Burns' April 18, 2002 APS report. Seely concluded as follows:

**MEDICAL HISTORY**

Physical restrictions and limitations provided for this review are obtained from the Attending Physician's Statement of Functional Capacity dated 4/18/2002 signed by Dr. James Burns. There are no limitations for transportation. Ms. Stellas is capable of lifting and carrying 15 lbs. occasionally. There are several moderate limitations for bending/stooping/squatting, standing, sitting, and change of position, reaching forward/overhead, grasping, handling, finger dexterity, and use of concentrated visual attention. Ms. Stellas must completely avoid dust/gases/fumes, temperature extremes, closed spaces, drafts/damp areas, assuming cramped or unusual positions, pushing/pulling/twisting of arm or leg controls, repetitive movement of feet or hands, climbing or being at heights, and balancing. Due to these restrictions, Ms. Stellas is not capable of performing her own occupation....

**TRANSFERABLE SKILLS ANALYSIS**

Alternative sedentary occupations were identified, using information provided by the Dept. of Labor and analyzing the Labor Market in the local geographical area of Knoxville, TN.

5

The following jobs were among those identified:
1) Order Department Supervisor (DOT # 169.167-038)
Coordinate and initiate order-writing procedures, using knowledge of
company products, pricing methods, and discount classifications.
Supervise workers writing masters orders used by production, shipping,
invoicing, cost and estimating departments. Confer with company
management to develop effective methods and procedures to increase
sales, expand markets and promote business.
Estimated annual wage in Knoxville, TN is $37,940 per year.

2) Operations Officer/Financial or Loan Institution (DOT # 186.137-014)
Supervise and coordinate activities of personnel involved in performing
internal operations in department of branch office of financial institution.
Audit accounts, records of proof, and certifications to ensure compliance
of workers with established standard procedures and practices.
Prepare work schedules and assign duties to operations personnel to
ensure efficient operation of department or branch.
Estimated annual wage in Knoxville, TN is $53,840 per year.

3) Bursar/Education Institution (DOT # 160.167-042)
Direct and coordinate activities of workers engaged in Keeping complete
books of tuition fees and other receipts for educational institution.
Periodically report receipts to board of trustees or other party ultimately
responsible for financial condition of institution. Analyze financial
information and prepare financial reports to determine or maintain record
of assets, liabilities, profit/loss and expenses. Predict revenues and
expenditures, and submit reports to management.
Estimated annual salary in Knoxville, TN is $43,060 per year.

## SUMMARY

Ms. Stellas is a 38-year-old account's receivable supervisor who has been
out of work since 1-25-00 due to diagnoses of osteoarthritis and
fibromyalgia. Based on the education, training and work experience that
Ms. Stellas has, she possesses excellent transferability skills to perform
sedentary work in other occupations that do not require her to perform
repetitive computer and keyboarding skills. In addition, the occupations
identified in this TSA would not require prolonged periods of sitting or
standing. Ms. Stellas has the functional capacity to perform sedentary
occupations within the restrictions and limitations indicated on the 4/18/02
APSFC [Attending Physician Functional Capacity Statement]. Employers
from the industries that are most likely to hire for the alternative
occupations exist in the geographic area of Knoxville, TN.

6

In a letter dated July 11, 2002, MetLife terminated plaintiff's LTD benefits, effective July 20, 2002. MetLife stated there was insufficient objective and clinical medical evidence to establish that plaintiff had a totally disabling condition that prevented her from performing any occupation for which she was qualified based upon her education, training or experience.

On July 18, 2002, Dr. Burns wrote back to MetLife, explaining that his opinion had been misconstrued:

> I am writing to clarify Ms. Stellas's status as documented on prior records and forms of 4/18/02. In item #8, the patient is disabled "for any occupation." She has "no limitations" in only 3 categories in items 2 & 3. "Some limitations" is vague, but in her case would apply to 50 to 75% of the time or more. I've also documented that she has retrogressed.

On August 12, 2002, Dr. Daniel R. Koelsch, a chiropractic physician, opined that plaintiff qualified for LTD benefits due to the impairments associated with her conditions. He noted that Stellas has tried every feasible treatment option and has been diligent and consistent with her treatment. Dr. Koelsch indicated that due to the nature of the conditions described and their physical and emotional manifestations, it was his opinion that the patient was not qualified physically to perform in any job in the work place. Interestingly, Dr. Koelsch expressed the belief that "[t]o simply evaluate the patient on ... some pre-made form is ludicrous. ..."

Following plaintiff's reconsideration request, plaintiff produced additional medical records. After Stellas' September 30, 2002 visit, Dr. Burns described "active

fibromyalgia" with severe pain and "severe fatigue requiring daytime rest up to two hours." On October 2, 2002, Dr. Burns opined that Stellas could sit for less than one hour at a time, and stand or walk for less than one hour at a time. Lifting was limited to 10 pounds infrequently. He noted that plaintiff would need to elevate her legs to decrease swelling; would need one to two hours of bed rest during the workday; would need to rest for one to two hours for every three to four hours worked; and would be unable to sustain a 40-hour work week. He determined that she could not reasonably be expected to be reliable in her work, has a reasonable need to be absent from work on a chronic basis, and that she suffers daily lapses in concentration and memory.

An MRI study on plaintiff's cervical spine on October 2, 2002, noted some posterior disc protrusion at C6-7 that caused some mild effacement of the anterior thecal sac but no direct impingement upon the cervical cord, as well as very mild bulging of the C4-5 disc which did not appear significantly changed since plaintiff's prior exam. On October 16, 2002, David H. Hauge, M.D., FACS, performed a neurological/neurosurgical evaluation and found plaintiff had a small subligamentous disc herniation extending down behind the C7 vertebral body from the C6-7 interspace that did not appear to cause any significant cord compression. According to Dr. Hague, plaintiff had a C6-7 disc protrusion with a left cervical radicular syndrome, but was neurologically intact.

On February 24, 2003, the Social Security Administration (SSA) found that Stellas was disabled. The Administrative Law Judge (ALJ) determined that plaintiff's

exertional and nonexertional impairments precluded her ability to sustain full time activity at even sedentary exertion. The ALJ determined that plaintiff experienced "debilitating levels of fatigue and pain."

A physician consultant, Jeffrey Lieberman, M.D., Board Certified in Internal Medicine and Rheumatology, reviewed plaintiff's medical records for MetLife. On March 27, 2003, based upon the restrictions set forth by Dr. Burns on April 18, 2002, Dr. Lieberman found that plaintiff should be able to perform the duties of a light or sedentary occupation, particularly with typical medications used to treat plaintiff's conditions of osteoarthritis and fibromyalgia. Although Dr. Burns had expressed some question about plaintiff's cognitive abilities, Dr. Lieberman found that plaintiff had not received any formal cognitive testing to substantiate that she had any defined cognitive deficits. After speaking to Dr. Burns, Dr. Lieberman concluded that nothing in plaintiff's medical records indicated she was unable to perform the duties of a sedentary or light occupation. Dr. Lieberman determined as follows:

> I have reviewed the records in depth on this claimant and spoken to her Rheumatologist, Dr. James Burns. The claimant has osteoarthritis characterized by Heberden and Bouchard's nodes and cervical degenerative arthritis on MRI scan. There is no significant impingement and no cord compression based on MRI 10/02/02. She has some disk bulging of C4-5.
>
> Heberden and Bouchard's nodes are indicated on physician examinations by Dr. Burns.
>
> I spoke with Dr. Burns at length today. He could not substantiate any objective evidence that would suggest that claimant could not perform the duties of light or sedentary occupation. He states that her previous employer was "very [illegible]" and gave her a "hard time." He stated a secondary issue was that cognitively she seemed to be "dingy

9

sometimes." He states that she would sometimes forget appointments. He stated that she had some morning stiffness that her employer would have difficulty with.

. . . .

The AP's restrictions as of 4/18/02 would seem to indicate that the claimant should be able to perform the duties of a light or sedentary occupation. I see nothing in the records or notes to indicate that the claimant would not be able to perform light or sedentary occupation duties. I do not see any substantial change in any objective evidence that would warrant any difference in opinion. The MRI scan dated 10/2/02 did not substantiate any neuro foramen impingement or spinal cord impingement.

The claimant should be able to perform these duties particularly with typical medications to treat conditions of osteoarthritis and fibromyalgia. These will include anti-inflammatory medication, appropriate use of muscle relaxants or medications in the evening time to help with the sleep pattern, appropriate exercises for both arthritis and for fibromyalgia.

Although Dr. Burns had some question as to her cognitive abilities, there was no testing such as a Mini-Mental Status Exam which could be performed in the office or any more formal cognitive testing to substantiate that she has any defined cognitive deficits.

By letter to plaintiff dated April 9, 2003, MetLife upheld its prior decision to terminate plaintiff's claim for LTD benefits . MetLife advised plaintiff that it had reviewed Dr. Burns' medical records and his primary diagnosis of osteoarthritis and secondary diagnosis of fibromyalgia; the TSA performed by Seely; the records of plaintiff's chiropractor, Daniel R. Koelsch; the records of Dr. Hauge; and the opinion of Dr. Lieberman. MetLife explained that Dr. Lieberman had contacted Dr. Burns, who "could not substantiate any objective evidence that would suggest [plaintiff] could not perform the duties of light or sedentary occupation." Accordingly, MetLife determined that the medical and vocational evidence in the administrative record did not support a finding

that plaintiff had a disability that would prevent her from performing any gainful

occupation for the period of time beyond July 19, 2002.


On January 7, 2004, plaintiff brought this action pursuant to 29 U.S.C. §

1132(a)(1)(B) to obtain judicial review of the denial of her claim for LTD benefits under

the Plan.  She asserts that MetLife's decision was arbitrary and capricious.  Plaintiff

seeks a declaration of her rights under the policy at issue, payment of back benefits due

her, and an award of attorney's fees and costs.  MetLife has filed a counterclaim against

Stellas for its overpayment of LTD benefits to her in the sum of $20,404.00.


The Plan, effective November 1, 2000, provides in part:

### 3.2  POWERS AND DUTIES OF THE PLAN ADMINISTRATOR

The Plan Administrator shall interpret the Plan, shall decide any questions
concerning the eligibility of employees to participate in the Plan, and in
general shall administer the Plan, provided that the Company may
delegate the fiduciary duty to determine whether a participant is and/or
remains disabled under the Plan's definition of disability to a third party
claims fiduciary which shall be responsible for:  (I) making such
determinations, (ii) advising participants of such determinations and their
rights to appeal such initial and subsequent determinations, and (iii)
handling all appeals in accordance with the Plan's claims and appeals
procedures described in Sections 3.6 and 3.7.  Any decision by the Plan
Administrator or its delegate to the extent such delegate is a Plan
fiduciary, shall be final and binding upon all parties.  The Plan
Administrator and any delegate which is a Plan fiduciary shall have
absolute discretion in carrying out its responsibilities under the Plan.

The Plan Administrator shall maintain or cause to be maintained, such records and shall make such rules, computations, interpretations and decisions as may be necessary or desirable for the proper administration of the Plan. The Plan Administrator shall determine eligibility to participate and, unless delegated to a third-party claims fiduciary, the time, manner, amount and recipient of any payment of benefits.

## 3.3  ALLOCATION AND DESIGNATION OF RESPONSIBILITY

The Plan Administrator shall have the authority to delegate to any person any fiduciary responsibility under the Plan. Unless the responsibility to determine claims and handle appeals is delegated to a third-party claims fiduciary (the "Claims Fiduciary"), the Plan Administrator shall be responsible for the determinations of all claims and shall handle all appeals. If a Claims Fiduciary is appointed, all duties assigned to the Plan Administrator in Sections 3.5, 3.6 and 3.7 shall be the responsibility of the Claims Fiduciary. Any person may serve in more than one fiduciary capacity with respect to the Plan. The Plan Administrator may also appoint and delegate to one or more individuals the power and duty to handle the non-fiduciary administrative functions of the Plan. The Plan Administrator may employ counsel and agents as well as such clerical and accounting services as it may require in carrying out the provisions of the Plan or complying with the requirements of ERISA or other federal law. Any person or firm so employed may be a person or firm then, theretofore or thereafter serving the Company in any capacity.

* * *

## 3.7  REVIEW OF DENIED CLAIMS

The decision of the Claims Fiduciary shall be final and conclusive.


The ASA between MetLife and BWXT provides in part:

Metropolitan agrees to perform the services ... set forth below.

* * *


3.  Evaluate claims submitted, consistent with the terms and provisions of the Plan and with the interpretive rules and regulations issued by the appropriate Plan Fiduciary. This evaluation of claims shall be subject to a full and fair review by the appropriate Plan Fiduciary and will include the following when deemed appropriate by Metropolitan: ...

12

* * *

7.  Metropolitan will act as a Plan Fiduciary for the limited purpose of providing a full and fair review of claims determinations in accordance with ERISA Section 503.


The Sixth Circuit has ruled that summary judgment procedures are inapposite to ERISA actions to recover benefits and, thus, should not be utilized in their disposition. *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 619 (6th Cir. 1998).  As to the merits of the claim, the court should conduct either a "*de novo*" or "arbitrary and capricious" review based solely on the administrative record which had been before the plan administrator/decision maker.  In doing so, the court should consider the parties' arguments concerning the proper analysis of the evidence contained in the administrative record.  However, with certain narrowly drawn exceptions, review is restricted to the evidence presented to the administrator.  *Wilkins*, *supra*; *Marchetti v. Sun Life Assurance Co. of Canada*, 30 F.Supp.2d 101, 1004 (M.D. Tenn. 1998).


## STANDARD OF REVIEW

In actions challenging the denial of ERISA plan benefits, courts review the decisions of claims fiduciaries such as MetLife under a deferential abuse of discretion standard where, as here, the plan gives the claims fiduciary "discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co.  v. Bruch*, 489 U.S. 101, 115 (1989); *see* also *Shields v. Reader's Digest Assoc., Inc.*, 351 F.3d 536, 541 (6th Cir. 2003); *Marquette Gen. Hosp. v. Goodman*

13

*Forest Ind.*, 315 F.3d 629, 632 (6th Cir. 1998). In this case, the Plan states "The Plan Administrator and any delegate which is a Plan fiduciary shall have absolute discretion in carrying out its responsibilities under the Plan." By the ASA, MetLife was designated a Plan Fiduciary for purposes of claims determinations. Accordingly, the Plan bestows upon MetLife as Claims Fiduciary absolute discretionary authority to determine eligibility for benefits and to construe the Plan's terms.

The arbitrary and capricious standard is highly deferential and "is the least demanding form of judicial review of administrative action. When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Shields,* 331 F.3d at 541 (internal quotations omitted); *Killian v. Healthsource Provident Administrators, Inc.*, 152 F.3d 514, 520 (6th Cir. 1998) (quoting *Perry v. United Food & Commercial Workers Dist. Unions*, 405 & 442, 64 F.3d 238, 241 (6th Cir. 1995)). Under the standard, in order to be upheld, the decision must be "the result of a deliberate principled reasoning process," and be "supported by substantial evidence." *Killian v. Healthsource Provident Administrators, Inc.*, 152 F.3d 514, 520 (6th Cir. 1998). Yet the review of the decision must include some review of the quality and quantity of the medical evidence and the opinions of both sides of the issues. Indications of arbitrary and capricious decisions include a lack of substantial evidence, a mistake of law, bad faith and a conflict of interest by the decision-maker. *Caldwell v. Life Insurance Co. of North America*, 287 F.3d 1276, 1282 (10th Cir. 2002).

14

## TERMINATION OF BENEFITS

The Plan defines the term "totally disabled" as follows:

Under the long-term disability plan, you are considered totally disabled
during your first 24 months of long-term disability if you are unable to
perform the duties of your regular job with the Company due to illness or
injury, and are under the regular care of a licensed practicing physician.

* * *

After you have received long-term benefits for 24 months, you are
considered totally disabled if you remain under the regular care of a
licensed practicing physician, and you are unable to work at any job for
which you might be qualified, based on your education, training and
experience.  In order to continue receiving benefits, you must furnish
periodic medical evidence of your illness or injury if requested by the
Company.

Fibromyalgia is pain in the fibrous tissues, muscles, tendons, ligaments and other

white connective tissues, frequently affecting the low back, neck, shoulders and thighs.

It is a type of muscular or soft-tissue rheumatism that affects principally muscles and

their attachment to bones.  This condition has only been recognized over the last

several years.  It causes severe musculoskeletal pain, stiffness, fatigue, sleep

disturbances, lack of concentration, changes in mood or thinking, anxiety and

depression.  Physical examinations will generally be normal and the disease cannot be

confirmed by objective tests.  Rather, the diagnosis is made by exclusion and the

elicitation of tenderness at certain "focal tenderpoints."  Fibromyalgia patients may also

have psychological disorders.  The disease afflicts women significantly more other than

men.  *See The Merck Manual* at 1369-70 (16th ed. 1992); *Preston v. Secretary H.H.S.*,

854 F.2d 815, 818 (6th Cir. 1988); *Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir.

1996); *Russell v. UNUM Life Ins. Co. of America*, 40 F.Supp.2d 747 (D.S.C. 1999),

citing *Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech., Inc.*, 125

F.3d 794, 796 (9th Cir. 1997) and The Arthritis Foundation, *Fibromyalgia*, Arthritis

Foundation pamphlet at 1, 5 (1992).  It is a potentially disabling condition.  *See id.*, and

*Preston*, 854 F.2d at 818; *Godfrey v. Bellsouth Telecommunications, Inc.*, 89 F.3d 755

(11 Cir. 1996).


        Plaintiff contends MetLife's decision to terminate her LTD benefits rests only

upon a misconstruction of Dr. Burns' report, a TSA based on that misunderstood

opinion, and the conclusions of a non-examining consultant.  She argues that MetLife's

interpretation of Dr. Burns' APS constitutes an arbitrary and capricious determination.

Stellas further notes the Plan did not obtain an independent medical examination.

Plaintiff asserts the limitations assessed by Dr. Burns on all occasions are consistent

and would preclude her ability to sustain a 40-hour work week.  According to Stellas, Dr.

Burns has made the appropriate diagnostic findings for fibromyalgia.  In particular,

plaintiff claims there is no type of competitive employment that would accommodate the

need for rest periods up to two hours in length during the workday.


        As to the April 2002 APS form drafted by MetLife, Stellas claims it is, at best,

vague.  In contrast to other forms of record, the April 2002 form allowed only three

choices:  "no limitation"' "some limitation"' and "avoid completely."  According to plaintiff,

virtually any disability claimant must be placed in the "some limitation" category in terms

of capacity for sitting and standing, as only a bed-ridden invalid must "avoid completely"

sitting and standing, and only an individual with no physical disability at all would have "no limitation." Thus, Stellas contends the April 2002 APS form assesses limitations in such broad categories as to be meaningless.

In *Black & Decker Disability Plan v. Nord*, 538 U.S. 1965, 123 S.Ct. 1965 (2003), the Supreme Court held that plan fiduciaries "are not obliged to accord special deference to the opinions of treating physicians." *Id.* at 1967. The Sixth Circuit has also determined that "[a] treating physician's opinion is not entitled to greater weight in the ERISA context." *Jackson v. Metropolitan Life*, 24 Fed. Appx. 290, 2001 WL 1450811 at * 2 (6th Cir. Oct. 29, 2001). Likewise, "a plan administrator's determination of benefit eligibility is not rendered arbitrary or capricious merely because a treating physician disagrees with other medical diagnoses of the claimant's condition." *Kenny v. General Motors Corp.*, 2001 WL 1450669 (6th Cir. Nov. 9, 2001). Therefore, a claims fiduciary may reasonably rely upon the determination of a physician engaged to review the claimant's medical records that the claimant is not disabled. *See Schmidlkofer v. Directory Distributing Assoc., Inc.*, 107 Fed. Appx. 631, 2004 WL 1921184 at * 1 (6th Cir. Aug. 25, 2004).

In this case, MetLife claims Dr. Lieberman's review establishes that plaintiff was not totally disabled under the Plan's "any occupation" definition of total disability. Although plaintiff had some limitations, Dr. Lieberman found she could perform the duties of a light or sedentary occupation. Defendants assert Dr. Lieberman based his opinion that plaintiff was not totally disabled not only upon his review of plaintiff's

17

medical records, but also upon his conversation with Dr. Burns, who, according to Dr. Lieberman, could not provide any objective evidence that plaintiff could not perform the duties of a light or sedentary occupation. MetLife further argues the reasonableness of its decision that plaintiff was not totally disabled from any occupation is also supported by Seely's TSA, in which she determined that plaintiff possessed excellent transferability skills to perform sedentary work in other occupations that did not require Stellas to perform repetitive computer and keyboarding skills, and that suitable employers for such positions existed in the Knoxville area.

## SOCIAL SECURITY DETERMINATION

As noted previously, on February 24, 2003, Stellas was found disabled (and unable "to perform even sedentary work on a sustained basis") by the SSA. In light of the determination, plaintiff argues that MetLife's denial of LTD benefits is arbitrary and capricious.

According to the Supreme Court, there are "critical differences between the Social Security disability program and ERISA benefit plans." *Nord*, 538 U.S. 1965, 123 S.Ct. 1965. The Supreme Court reasoned:

> In contrast to the obligatory, nationwide Social Security program, nothing in ERISA requires employers to establish employee benefit plans. Nor does ERISA mandate what kind of benefits employers must provide if they chose to have such a plan. Rather, employers have large leeway to design disability and other welfare plans as they see fit. In determining entitlement to Social Security benefits, the adjudicator measures the claimant's condition against a uniform set of federal criteria. The validity of a claimant to benefits under an ERISA plan, on the other hand, is likely to turn, in large part, on the interpretation of the terms in the plan at issue.

18

*Id.*, 123 S.Ct. at 1971.  *See Hurse v. Hartford Life and Accident Ins. Co.*, 77 Fed. Appx. 310, 2003 WL 22233532 at *6 (6th Cir.  Sept. 23, 2003) (holding claims fiduciary's conclusion was reasonable and based on the evidence, and the fact that it differed from the ALJ's conclusion regarding plaintiff's claim for Social Security disability benefits did not make the claims fiduciary's decision arbitrary and capricious).  An ERISA plan fiduciary, having the power to construe the terms of an ERISA plan, is not bound by what the SSA finds.  *Bass v. TRW Employee Welfare Benefits Trust*, 2004 WL 103001 at *3 (6th Cir. Jan. 21, 2004).

In *Darland v. Fortis Benefits Ins. Co.*, 317 F.3d 516 (6th Cir. 2003), the Sixth Circuit held it was "totally inconsistent" for the insurer to require the plaintiff to apply for Social Security benefits, avail itself of the Social Security determination so as to assert an overpayment, yet simultaneously deny that plaintiff is disabled.  In *Pittman v. Aetna Life Ins. Co.*, No. 1:02-cv-163 (E.D. Tenn. October 16, 2003), the district court found the award of disability benefits by SSA to be an "independent factor" in finding a termination of benefits arbitrary and capricious.  Defendants argue, however, that subsequent decisions of the Sixth Circuit have recognized that *Darland* was overruled and abrogated by the Supreme Court in *Nord*, 538 U.S. 1965, 123 S.Ct. 1965.  *See Hurse*, 77 Fed. Appx. 310, 2003 WL 22233532 at *4.

The court acknowledges that MetLife is not bound by the disability determination of SSA.  *See Seiser v.  Unum Provident Corp.*, 2005 WL 943697 * 3 (6th Cir.  April 22, 2005); *Lee v.  MBNA Long Term Disability & Benefit Plan*, 2005 WL 705771 at * 12 (6th

19

Cir. March 29, 2005). However, in light of the reliance by the ALJ on the medical opinion and findings of Dr. Burns, along with the determination that plaintiff's assertions concerning her ability to work are credible, it appears arbitrary and capricious for MetLife to not consider and discuss the Social Security decision in its final termination letter. Additionally, given that Dr. Burns informed MetLife that he felt his April 2002 APS had been misinterpreted, use of that report as a basis of the TSA and Dr. Lieberman opinions seems questionable. Accordingly, MetLife's decision terminating plaintiff's LTD benefits will not be upheld by this court.

## COUNTERCLAIM FOR REIMBURSEMENT

On March 21, 2003, SSA notified plaintiff that it was awarding her benefits of $1,071.00 per month going forward, plus a lump sum payment of $26,217.33, representing past benefits due for July 2000 through January 2003, minus attorney's fees. As a result of this award of benefits, plaintiff was allegedly overpaid by MetLife the total sum of $20,404.00. It is undisputed that Stellas has not repaid any of the $20,404.00 to MetLife.

In its amended answer and counterclaim, MetLife seeks reimbursement from plaintiff of the overpayment of LTD benefits through "equitable relief" under ERISA enforcing the terms of the Plan (including imposition of a constructive trust or restitution) or though a federal common law claim for unjust enrichment.

20

The Plan provides LTD benefits be "offset" for any "other income," including Social Security disability benefits, and Stellas was required by the Plan to apply for Social Security benefits. It is undisputed that plaintiff signed a reimbursement agreement on June 27, 2000, in which she agreed to notify MetLife of an award of Social Security benefits and to repay MetLife any overpayment resulting from the award [*See* Reimbursement Agreement]. In return, MetLife paid plaintiff LTD benefits under the Plan without subtracting therefrom estimated amounts payable to her under the Social Security Act. Now that plaintiff's Social Security disability benefits, including past due benefits, have been approved, the Plan asserts that Stellas has been overpaid. Plaintiff, however, asserts that ERISA does not permit the remedy sought by MetLife.

Plaintiff claims the counterclaim "relates to" an employee benefit plan, and ERISA therefore preempts any state law cause of action. 29 U.S.C. § 1144. Stellas further asserts "[f]ederal common law" cannot be used to supply federal question jurisdiction over causes of action or remedies not authorized by ERISA. *Qualchoice, Inc. v. Rowland*, 367 F.3d 638, 642 (6th Cir. 2004); *Community Health Plan v. Mosser*, 347 F.3d 619, 624 (6th Cir. 2003).

Plaintiff argues that fiduciaries are limited to suing to either enjoin practices in violation of the Plan or to seek "other equitable relief" to redress violation of the Plan. Section 1132(a)(3). She asserts the Supreme Court has interpreted "other equitable relief" to mean only that relief available in a court of equity, and precludes legal remedies such as money damages. *Great-West Life & Annuity Ins. Co. v. Knudson*,

21

534 U.S. 204, 209-10, 122 S.Ct. 708 (2002). Following *Knudson*, the Sixth Circuit concluded that a "plan fiduciary's action to enforce a plan-reimbursement provision is a legal action, regardless of whether the plan participant or beneficiary recovered from another entity and possesses that recovery in an identifiable fund." *Qualchoice, Inc. v. Rowland*, 367 F.3d 638 (6th Cir. 2004). Therefore, plaintiff argues MetLife's claim for payment of money by Stellas pursuant to the Plan reimbursement provision is a legal action, not an equitable one. She further contends there is no evidence that an "identifiable fund" to which MetLife is the true owner is in her possession.

The Sixth Circuit has held that an action to enforce a reimbursement provision in an ERISA plan is not cognizable under federal common law. *Qualchoice, Inc. v. Rowland*, 367 F.3d 638, 642 (6th Cir. 2004), *cert. denied*, 1255 S.Ct. 1639 (2005). The Sixth Circuit has also held that an action to enforce a reimbursement provision in an ERISA plan is a legal action and, therefore, not recognizable under ERISA. *Id.* at 650. Accordingly, this court has no jurisdiction to adjudicate MetLife's counterclaim. *See Nichols v. Unum Life Ins. Co.*, No. 3:04-cv-146, 2005 WL 1669338 (S.D. Ohio July 18, 2005).

**IT IS SO ORDERED.**

**ENTER:**

22

**s/Thomas W.  Phillips**
**UNITED STATES DISTRICT JUDGE**